IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

COLEEN HANSON, Personal
Representative of the Estate of
CARLETTA LEE CRISTMAN,                        No. 3:11-cv-1133-HZ

          Plaintiff,

     v.
                                              OPINION & ORDER

LES SCHWAB TIRE CENTERS OF
WASHINGTON, INC., a
Washington corporation,

          Defendant.


Gary J. Susak
SUSAK & POWELL, P.C.
222 S.W. Columbia Street, Suite 1120
Portland, Oregon 97201

          Attorney for Plaintiff

/ / /
/ / /


1 - OPINION & ORDER

Gordon Welborn
Sean M. Bannon
HART WAGNER, LLP
1000 S.W. Broadway, Twentieth Floor
Portland, Oregon 97205

     Attorney for Defendant

HERNANDEZ, District Judge:

     Plaintiff Coleen Hanson, the personal representative of the estate of her deceased sister Carletta Cristman, brings this personal injury action against defendant Les Schwab Tire Centers of Washington.  Defendant moves for partial summary judgment on a discrete issue arising under Washington's wrongful death statute.  I grant the motion.

## BACKGROUND

     Decedent was driving her car in Washington on November 10, 2008, and was in a collision with a vehicle driven by defendant's employee.  Decedent suffered injuries which, according to plaintiff, caused decedent's death in September 2009.  In the Complaint, plaintiff alleges that defendant's employee negligently operated the vehicle in several specified ways, and that as a result of that negligence, decedent suffered injuries causing both economic and non-economic damages.  Compl. at ¶¶ 3-6.

     As further explained below, the issue raised in the motion concerns whether decedent's siblings were "dependent" on decedent for "support."  Wash. Rev. Code § (WRC) 4.20.020. Plaintiff concedes that decedent's brother, Raymond Cristman, was not dependent on decedent for support under the Washington statute.  However, the parties dispute whether plaintiff, or another sister, Verlie Cristman, depended on decedent for support.

/ / /

2 - OPINION & ORDER

A.  Verlie Cristman

Verlie Cristman has been employed at the Hanford Nuclear Plant in the Tri-Cities region of Washington for nearly twenty years.  Verlie Cristman Dep. at 9 (Ex. H to Bannon Decl.). Decedent and Verlie Cristman lived together from 2002 until May 2008, in decedent's home in Richland, Washington.  Id. at 16, 18.  Decedent's and Verlie Cristman's stepfather had purchased the home for decedent in 1987.  Id. at 16, 17.  Although he paid cash, decedent took a mortgage out on the house at some point before her stepfather died in 2002.  Id. at 16-18.  Decedent cared for her stepfather until he died.  Id. at 15, 16.  After he died, decedent could not afford the mortgage payments so Verlie Cristman moved into the home with her sister.  Id. at 16-18.

During this time, Verlie Cristman paid for all of decedent's expenses, including the mortgage, decedent's medical expenses (decedent had no insurance), and the utilities.  Id. at 17, 18, 20, 23.  At some point, Verlie Cristman purchased a car for decedent to use to get around while Verlie Cristman was working.  Id. at 38.  Decedent did not work during this time and until she began to receive social security disability sometime in 2008, she had no income.  Id. at 20, 21, 23.

Decedent did, however, provide certain services to Verlie Cristman.  Verlie Cristman testified in her deposition that during the time she lived with decedent, decedent did all the housework so that when Verlie Cristman arrived home after work, she did not have to do anything.  Id. at 41 (Ex. 2 to Pl's Resp. Mem.); see also Id. at 25 (Verlie Cristman stating that she was working twelve-hour shifts and "it was nice to come home and have the house clean and dinner ready"; further noting that "[i]t's like having a free maid" and that she could not have afforded a maid).  Verlie Cristman believed this was decedent's "way of compensating" because

Verlie Cristman was paying all the bills.  Id.  Decedent also babysat for Verlie Cristman's granddaughter.  Id.  From 2005 to 2008, Verlie Cristman, her daughter Carly, her granddaughter Kami, and decedent shared a home.  Id. at 44.

In May 2008, Verlie Cristman bought a mobile home for decedent so decedent could have some privacy.  Id. at 18, 23 (Ex. H to Bannon Decl.).  Decedent lived there until the accident.  Decedent paid Verlie Cristman $150 per month in rent between May and November 2008, and also paid the trailer park $250 per month for the lot space.  Id. at 24.  Decedent's only income during this time was her social security disability payment.  Id. at 21.  Because she was occasionally "really broke," she sometimes went to Verlie Cristman's home to do laundry and eat dinner.  Id. at 24-25.  After moving to the mobile home, decedent continued to provide housekeeping services to Verlie Cristman and to babysit after school for Verlie Cristman's granddaughter.  Id. at 22 (Ex. 2 to Pl's Resp. Mem.).

In April 2009, after it was clear that decedent would not be moving back to the mobile home, Verlie Cristman gave the mobile home to the mobile home park.  Id. at 20, 25 (Ex. H to Bannon Decl.).

B.  Plaintiff Coleen Hanson

Beginning in late June 2009, plaintiff and her husband Rod Hanson used their home for the adult foster care of decedent through a state-funded program.  Pl. Dep. at 10, 15 (Ex. F to Bannon Decl.); see also Pl. Resp. to Interrog. 20 (Ex. A to Bannon Decl.).  Decedent lived there until she died in September 2009.  Id. at 10; Pl. Resp. to Interrog. 20.  Before decedent's accident, the Hansons had no plans to operate a foster care home.  Id. at 10.  To prepare their home for decedent, the Hansons had to place smoke detectors in the living areas that decedent occupied

and purchase fire extinguishers.  Rod Hanson Dep. at p. 15-16 (Ex. G to Bannon Decl.).  No

other renovations or purchases were required.  Id.

During the time decedent lived with the Hansons, Rod Hanson, who described himself as

the care provider for decedent, received $1,016 each month in compensation from the state.  Id.

at 40-43.  He was paid this amount for July and August 2009, but received no payment for

September 2009 because, according to Hanson, the state did not pay for the month in which the

decedent died.  Id.  The amount provided by the state was determined pursuant to a state formula

for decedent's care.  Id. at 41, 42.  Decedent also paid Rod Hanson her $480 monthly social

security check.  Id.; see also Pl. Dep. at 15, 17.

At the time decedent was living with the Hansons, plaintiff was a full-time employee of

the State of Oregon's Department of Consumer and Business Services.  Pl. Dep. at 5-6.  In the

summer of 2009, while decedent lived with them, plaintiff's salary from the state was

approximately $4,000 per month.  Id. at 51.  Rod Hanson is a real estate broker who testified that

having decedent move in with them did not affect his business because he had flexibility in his

schedule and was able to work around and accommodate decedent's needs.  Rod Hanson Dep. at

12 (Ex. G to Bannon Decl.).  During his deposition, he could not accurately remember if he had

any listings in the summer of 2009 but he thought he may have.  Id. at 11.

However, Coleen Hanson states that because of the economic downturn in 2008, Rod

Hanson was "no longer able to earn an income" and their only source of income was from

plaintiff's employment with the state.  Coleen Hanson Affid.  She further states that at this time,

they were struggling without Rod Hanson's income and were forced to sell their boat and turn

back a motor home to avoid a repossession.  Id.  She indicates that it was a "financial blessing" to

5 - OPINION & ORDER

have the income they received for caring for decedent.  Id.  For the calendar year 2009, the

Hansons' joint tax return shows an adjusted gross income of $43,272.  Ex. C to Bannon Decl.

Finally, in her deposition, Verlie Cristman stated that decedent had "talk[ed] about maybe

going to Salem and babysitting Coleen's grandkids" after living in the mobile home "for a while."

Verlie Cristman Dep. at 23 (Ex. 2 to Pl's Resp. Mem.).

STANDARDS

Summary judgment is appropriate if there is no genuine dispute as to any material fact

and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The

moving party bears the initial responsibility of informing the court of the basis of its motion, and

identifying those portions of "'the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence

of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting

Fed. R. Civ. P. 56(c)).

Once the moving party meets its initial burden of demonstrating the absence of a genuine

issue of material fact, the burden then shifts to the nonmoving party to present "specific facts"

showing a "genuine issue for trial."  Fed. Trade Comm'n v. Stefanchik, 559 F.3d 924, 927-28

(9th Cir. 2009) (internal quotation omitted).  The nonmoving party must go beyond the pleadings

and designate facts showing an issue for trial.  Celotex, 477 U.S. at 322-23.

The substantive law governing a claim determines whether a fact is material.  Suever v.

Connell, 579 F.3d 1047, 1056 (9th Cir. 2009).  The court draws inferences from the facts in the

light most favorable to the nonmoving party.  Long v. City & County of Honolulu, 511 F.3d 901,

905 (9th Cir. 2007).

6 - OPINION & ORDER

If the factual context makes the nonmoving party's claim as to the existence of a material

issue of fact implausible, that party must come forward with more persuasive evidence to support

his claim than would otherwise be necessary.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,

475 U.S. 574, 587 (1986).

DISCUSSION

Plaintiff makes a preliminary argument that defendant's motion is premature because

plaintiff has not yet elected to proceed under Washington's wrongful death statutes, WRC

4.20.010, 4.20.020, and may, depending on the evidence at trial, elect instead to proceed under

either one of two survivorship statutes, WRC 4.20.046, 4.20.060.  Because plaintiff cites no

statute in her Complaint and simply pleads an untitled claim alleging negligence, I construe the

Complaint to pose alternative claims, meaning plaintiff's claims are brought under either the

wrongful death statute or one of the two survivorship statutes.  Because the wrongful death

statute is the basis of one of the alternative claims at this point, defendant's motion is not

premature.  Moreover, as defendant notes, the issue is the same regardless of whether plaintiff

proceeds under the wrongful death statutes or the survivorship statutes.  Compare WRC 4.20.020

(identifying beneficiaries of a wrongful death action) and WRC 4.20.060 (identifying

beneficiaries of a survivorship action).  Thus, the issue is relevant regardless of plaintiff's

election.

I.  Washington's Wrongful Death Statute

The parties agree that Washington law applies to this dispute.  Under that law, "[w]hen

the death of a person is caused by the wrongful act, neglect, or default of another his or her

personal representative may maintain an action for damages against the person causing the

7 - OPINION & ORDER

death[.]"  WRC 4.20.010.  However, the action allowed by WRC 4.20.010 is "for the benefit of

the wife, husband, state registered domestic partner, child or children, including stepchildren, of

the person whose death shall have been so caused."  WRC 4.20.020.  The statute continues:  "If

there be no wife, husband, state registered domestic partner, or such child or children, such action

may be maintained for the benefit of the parents, sisters, or brothers, who may be dependent upon

the deceased person for support, and who are resident within the United States at the time of his

or her death."  Id. (emphasis added).

　　　　In a recent Western District of Washington case, the court noted that WRC 4.20.020 does

not define the words "dependent" and "support."  Estate of Wasilchen v. Gohrman, No. C11-

0749JLR, _____ F. Supp. 2d. _____, 2012 WL 1432201, at *22 (W.D. Wash. Apr. 25, 2012).

But, the court cited a 2009 Washington Supreme Court case concerning the dependence of a

parent on a deceased child for the proposition that the word "dependent" in WRC 4.20.020 means

"some substantial dependency, a necessitous want on the part of the parent, and a recognition of

that necessity on the part of a child."  Id. at *23 (quoting Armantrout v. Carlson, 166 Wash. 2d

931, 936, 214 P.3d 914, 917 (2009)).

　　　　As the Armantrout court explained, "substantial dependence" is "a term having relation to

the circumstances of the plaintiff."  Armantrout, 166 Wash. 2d at 936, 214 P.3d at 917 (internal

quotation marks omitted).  Additionally, the "dependency must be based on the situation existing

at the time of decedent's death and not on promises of future contributions."  Id.  Furthermore, it

"cannot . . .  be created on the basis of emotional support alone."  Id.

　　　　Washington "courts have generally allowed claims by beneficiaries who can demonstrate

they had a need for the decedent's regular contributions of support" and have "disallowed claims

where the claimant cannot identify evidence suggesting that they needed or were dependent upon decedent's services." <u>Id.</u> at 936-37, 214 P.3d at 917 (internal quotation marks and brackets omitted).

The <u>Armantrout</u> court recognized that "Washington courts have long interpreted 'dependent for support' to require a showing of financial dependence." <u>Id.</u> at 937, 214 P.3d at 917.  It noted that "a majority of wrongful death suits by second tier beneficiaries involve assessments of the monetary contributions made by decedents to the parties asserting claims." <u>Id.</u> It also recognized, however, that "no Washington court has explicitly held that financial dependence must be assessed on the basis of monetary contributions alone." <u>Id.</u>  The <u>Armantrout</u> court then proceeded to tackle that question.

In <u>Armantrout</u>, the plaintiff was the mother of the eighteen-year old decedent.  <u>Id.</u> at 933-34, 214 P.3d at 915.  At the time of her death, the decedent was living at home with her mother. <u>Id.</u>  The mother had diabetes and was blind.  <u>Id.</u>  The decedent provided the mother with a variety of services including being her driver and reader and assisting her with medical needs such as glucose readings and insulin injections.  <u>Id.</u> at 934, 214 P.3d at 915-16.  The testimony at trial established that the services the decedent provided to her mother were valued at around $36,553 per year.  <u>Id.</u> at 934, 214 P.3d at 916.  Decedent also contributed her $588 monthly disability benefits check to the household expenses.  <u>Id.</u>

The <u>Armantrout</u> court rejected the defendant's argument that proof of <u>financial</u> dependence by the beneficiary and the provision of a monetary contribution by the decedent were required for a second tier beneficiary to proceed with a wrongful death claim.  <u>Id.</u> at 938-940, 214 P.3d at 918-19.  It concluded that the provision of services with a monetary value could be

9 - OPINION & ORDER

considered when assessing a claimant's dependency on the decedent for support.  Id. at 941, 214 P.3d at 919.  Notably, however, the court approved of the jury instruction given by the district court which excluded the "everyday services a child would routinely provided" and any "emotional support" the child provided her parents from consideration.  Id. at 939, 214 P.3d at 918.  The court explained that this sufficiently guided the jury and "accurately employ[ed]" the language of the statute and the holdings from the court's earlier cases.  Id. at 940, 214 P.3d at 919.

The court was careful to reject the argument that by allowing services to be included in the dependency assessment, any parent who showed a dependence on services would qualify as a second tier beneficiary.  Id.  The court plainly stated that this was "incorrect."  Id.  Because the jury instruction excluded "the everyday services a child would routinely provide," the trial court "clearly established the boundaries within which the jury" could consider the mother's dependence on the services provided by decedent.  Id.  The jury was appropriately allowed to consider those particular services and their value, as well as the decedent's monthly contribution to determine that in the context of their entire financial situation, the parents were substantially dependent on decedent for support and would not otherwise have been able to pay for the services she provided.  Id.

II.  Discussion

Defendant argues that the record creates no reasonable inference that either plaintiff or Verlie Cristman had substantial financial dependency on decedent at any time and therefore, non-economic damages may not be recovered by decedent's estate.  Plaintiff argues that both plaintiff and Verlie Cristman were dependent on decedent for support, or that there are at least issues of

10 - OPINION & ORDER

material fact on that issue precluding summary judgment to defendant.

    A.  Verlie Cristman

    I agree with defendant that no reasonable juror could conclude that Verlie Cristman was substantially dependent on decedent, financially or otherwise.  As to financial support, the only reasonable inference from the record is that decedent depended on Verlie Cristman for support, not the other way around.  Verlie Cristman moved into the home decedent occupied because decedent could no longer afford to live there after her stepfather died.  During this time, Verlie Cristman paid for decedent's expenses such as the mortgage, medical expenses, and utilities.  She also bought decedent a car.  Only at some point in 2008 when decedent began to receive social security benefits did decedent have any income at all.

    Even after decedent moved to the mobile home and paid $150 per month to Verlie Cristman in rent between May 2008 and November 2008, no reasonable juror could conclude that Verlie Cristman was substantially dependent on this monthly payment for support.  At the time, Verlie Cristman earned more than $70,000 per year at her job.  See Ex. D to Bannon Decl. (Verlie Cristman 2006 & 2007 tax records); Verlie Cristman Dep. at 9, 23 (Ex. H to Bannon Decl.) (stating that she worked at Hanford Nuclear Reservation with Washington River Protection Services as a nuclear chemical operator for approximately nineteen years and worked there full time while living with decedent).

    Although Armantrout allows the provision of services to be considered as "support," the undisputed facts in this case, and any reasonable inferences from those facts, show that Verlie Cristman was not substantially dependent on the services provided to her by decedent, and that the services here do not qualify as support for Verlie Cristman.  First, the record shows that

11 - OPINION & ORDER

during the time they lived together, and continuing after decedent moved to the mobile home, decedent provided housekeeping services to Verlie Cristman, including cleaning and cooking. Armantrout teaches that "dependent" is understood as essential - meaning "'unable to exist, sustain oneself, or act suitably or normally without the assistance or direction of another or others.'" See Armantrout, 166 Wash. 2d at 937-38, 214 P.3d at 917-18 (quoting Webster's Third New Int'l Dictionary 604 (2002) (noting that because WRC 4.20.020 did not define "dependent" it was appropriate to turn to the dictionary for meaning)). As valuable or desirous as having "maid" services may be, no reasonable juror could conclude that Verlie Cristman would have been unable to exist or sustain herself without a clean house or dinner waiting when she arrived home from work. This is not the type of "dependence" encompassed by the wrongful death statute.[1] In contrast, the decedent's blind and diabetic mother in Armantrout depended on decedent for services basic to survival including reading, monitoring her glucose, and injecting her with insulin.

Second, decedent babysat Verlie Cristman's granddaughter. But, under any reasonable interpretation, this cannot be considered support to Verlie Cristman. The statute is unambiguously limited to "parents, sisters, or brothers" who were dependent on the decedent for support. It does not include other extended family members. No evidence in the record creates an inference that Verlie Cristman herself was substantially dependent on decedent's babysitting.

---

[1] It is also worth noting that the only reasonable understanding of the living arrangements was that decedent provided the services in lieu of making a financial contribution to the living expenses. "The agreed upon living arrangement was that [decedent] would . . . handle all basic household services[.]" Pl. Resp. Mem. at 4. Because providing housekeeping and meal preparation was the arrangement between Verlie Cristman and decedent, decedent provided the "everyday services" expected of her. Under Armantrout, such services are not recognized as "support." 166 Wash. 2d at 939-40, 214 P.3d at 918-10.

Accordingly, Verlie Cristman was not dependent on decedent for support within the meaning of WRC 4.20.020.

      B.  Coleen Hanson

Washington law clearly provides that any dependency claimed under WRC 4.20.020 must "be based on the situation existing at the time of decedent's death and not on promises of future contributions."  Armantrout, 166 Wash. 2d at 936, 214 P.3d at 917 (citing Grant v. Libby, McNeill & Libby, 145 Wash. 31, 37, 258 P. 842 (1927)).  Thus, any intention by decedent to provide babysitting to plaintiff's grandchildren does not create the requisite dependence because at the time decedent died, no such services had yet been provided.  Additionally, for the reasons stated above, these intended future services to plaintiff's grandchildren are not support provided to plaintiff.

The undisputed financial evidence is that Rod Hanson received a total of $2,032 from the State of Oregon for the foster care services provided to decedent in July and August 2009.[2] Decedent also paid the Hansons $960 by giving the Hansons the amount she received in social security disability for those two months.   As defendant notes, these payments total $2,992, which represents approximately seven-percent of the Hansons' adjusted gross income for 2009.  Defendant argues that such a percentage of income cannot reasonably be found to constitute "substantial dependence" by the Hansons.

I agree with defendant.  Although Rod Hanson's deposition testimony regarding his real estate business was equivocal in that he could not remember if he had any listings in the summer

---

    [2]  For the purposes of this motion only, I assume that the money paid by the state to Rod Hanson can be considered support to plaintiff.

13 - OPINION & ORDER

of 2009, I accept plaintiff's testimony that as a result of the economic downturn in 2008, Rod

Hanson was not earning any income in 2009. While having the money paid by the state and

decedent was a "financial blessing," that is insufficient to establish "dependence." Although

losing one income was undoubtedly distressful, being forced to sell a boat and return a motor

home does not establish that the Hansons were financially dependent on decedent. No

reasonable juror could conclude that without the money provided by decedent, plaintiff was

unable to exist or sustain herself. Granted, it may not have been in the lifestyle to which she was

accustomed, but given the income earned by plaintiff at her job with the state, which she

continued to earn while decedent was in her care, she fails to show that she was financially

dependent on decedent and she fails to create an issue of fact as to that dependence.

CONCLUSION

Defendant's motion for partial summary judgment [15] is granted.

IT IS SO ORDERED.

Dated this ___21st___ day of ___August___, 2012

Marco A. Hernandez
United States District Judge

14 - OPINION & ORDER